Argued December 4; affirmed December 27, 1945

# STATE *v.* WILSON

(164 P. (2d) 722)

Before BELT, Chief Justice, and KELLY, ROSSMAN, BAILEY, LUSK and HAY, Associate Justices.

*L. B. Sandblast,* of Portland, for appellant.

*T. B. Handley,* District Attorney, and *Philip M. Bagley,* Deputy District Attorney, both of Portland, for respondent.

BAILEY, J.   On June 29, 1944, the grand jury of Multnomah county, Oregon, returned an indictment accusing George Wilson of the crime of murder in the first degree and charging him with having, on June 24, 1944, in Multnomah county, Oregon, unlawfully, feloniously, purposely, and of deliberate and premeditated malice, killed one LeRoy K. Logan by shooting him with a revolver.   The jury found the defendant guilty of murder in the second degree, and, from the judgment sentencing him to life imprisonment in the state penitentiary, Wilson has appealed.

Defendant and Logan were employed at the Swan Island shipyards and were living in one of the barracks at or near the yards.   At about 10:30 or 11 o'clock in the morning on the day the crime was committed, defendant, Logan, and several other employes of the shipyard began shooting craps in one of the barracks. The game continued until evening, the defendant being present only intermittently.   At about 6 o'clock in the afternoon, an altercation arose concerning the

winnings, resulting in a fight in which defendant, Logan, R. L. Stokes, and others, were involved. Defendant suffered eye and head injuries.

He left the barracks and started for the first aid station. On his way he stopped at the guard office and reported the fight to Sergeant Cribbens. This was about 6:10 p. m. As defendant was about to leave, he asked Sergeant Cribbens what the penalty in this state was for killing a man. The sergeant replied that he thought it was "probably a life sentence". From there the defendant went to the first aid station and had his right eye, which by this time had swollen shut, and other injuries about his head treated. Upon leaving the first aid station, defendant proceeded to his own barracks, procured his revolver and returned to the barracks where the crap game had previously been in progress. When he arrived there he found a number of shipyard employes, including Logan and Stokes, engaged in the game of "cotch", in which playing cards are used and which is similar to blackjack. The players and the spectators were grouped around the bed on which the game was being played. Defendant took a position near by and watched the game for 15 or 20 minutes, according to his testimony, and from 25 minutes to three-quarters of an hour, according to the testimony of other witnesses. Then, without warning, he drew his revolver and shot both Stokes and Logan twice, seriously wounding Stokes. Logan died a few minutes later.

This shooting occurred about ten or fifteen minutes before 8 o'clock. Defendant was immediately arrested and taken to the police station. Some time between 9:30 and 10 o'clock p. m., he was asked by a deputy district attorney if he desired to make a statement

and he answered in the affirmative. Thereupon a stenographer was called and in her presence, the presence of two deputy district attorneys, and two detectives, he was questioned concerning the incidents that transpired before and at the time of the shooting. The questions and his answers thereto were reported in shorthand by the stenographer and later transcribed by her. The next morning these questions and answers, as transcribed, were read to and by him, and he stated that they were correct, and he signed each of the five sheets of the transcription.

At the beginning of the trial and after the jury had been selected and sworn, the court ordered that all "witnesses in this case on either side will be excluded from the courtroom during the proceedings except only when they are called as witnesses to testify." On the following day, and after three witnesses had testified for the state, the defendant made a motion "to have the court vacate its ruling excluding witnesses from the courtroom on the ground that it is taking undue surprise advantage of counsel for the defense, and is depriving the defendant of testimony that could be adduced before the jury with these other witnesses present so they could understand and refresh their testimony, * * * depriving the jury of the benefit of a witness refreshing his memory, * * *. The witnesses should be here and hear all the testimony that may be given or introduced, especially where there is a case where many people were present at the time, and the defendant has been taken by surprise and counsel can not readjust his method of trial after the trial has been commenced; no time to get these witnesses assembled and give them any information about what has been testified to, * * *."

Counsel for defendant further stated, as a ground for his motion, that the court had no authority, on his own motion, to exclude witnesses. This motion was resisted by the district attorney. In denying the motion, the court stated that the resistance thereof by the district attorney would be considered "as a specific request on behalf of the state that all witnesses be excluded except while on the witness stand."

Section 4-702, O. C. L. A., provides:

"If either party require it, the judge may exclude from the courtroom any witness of the adverse party not at the time under examination, so that he may not hear the testimony of other witnesses."

■ It is the defendant's contention that only when requested by one of the litigants has the court authority to exclude witnesses from the courtroom while not testifying. Even if we assume for the purpose of argument that the power of the court is thus limited, the resistance by the district attorney to the defendant's motion was, and properly so, considered by the court in denying the motion as a request that all witnesses be so excluded. Defendant's first objection to the action of the court was when he made the motion to have the order rescinded.

The reason specified in § 4-702, *supra*, for excluding witnesses is so that they "may not hear the testimony of other witnesses." One, and it would seem to be the only, reason given by the defendant for permitting his witnesses to be present was that they might hear the testimony of the other witnesses.

■ It was not, in our opinion, the intention of the legislature, in the enactment of § 4- 702, *supra*, to deprive the court of its discretionary power to exclude witnesses from the courtroom to prevent their testimony

from being influenced by others. 23 C. J. S., Criminal Law, § 1010, p. 377; 24 C. J. S., Criminal Law, § 1872, p. 770; 26 R. C. L., Trial, § 65, p. 1058; see also in this connection, *Schneider v. Haas,* 14 Or. 174, 12 P. 236, 58 Am. Rep. 296; *State v. Ede,* 167 Or. 640, 117 P. (2d) 235.

In 6 Wigmore on Evidence, 3rd Ed., § 1837, p. 347, the history of the expedient of separating witnesses "in order to detect falsehood by exposing inconsistencies," is traced from ancient times. "The practice", it is stated, "of course crossed the water with the common law. To-day, in many jurisdictions of the United States and Canada, *statutes* have expressly (though unnecessarily) made provision for sequestration, usually concerning its employment before committing magistrates." *Ibid.,* p. 349.

■ On the facts here presented, the court did not commit error in excluding the witnesses.

Defendant assigns as error the admission in evidence of the written statement hereinbefore mentioned. Defendant contends that the statement was made under the influence of fear and "while defendant was in such a mental state of mind and physical suffering to such an extent of being then irrational and not capable of making a true statement of the matters about which he was interrogated."

Before the statement was admitted, several state witnesses testified that it was voluntary and not made under the influence of hope or fear. Defendant likewise testified that the statement was not made under the influence of fear or promises. He did testify, however, that it was not made voluntarily for the reason that he did not know what he was doing at the time because of the pain he was suffering due to his injuries.

The court ruled that the statement was voluntarily made and, at the time it was admitted in evidence, instructed the jury that defendant's testimony relative to his condition at the time of making and signing it could be considered by the jury in determining the weight to be given to the statement.

■■ The statement to which we have been referring was an admision on the part of defendant that he had shot and killed LeRoy K. Logan. The determination of the trial court that it was obtained from the defendant "without the influence of hope or fear exercised by a third person will not be disturbed on review, unless there is clear and manifest error." *State v. Blodgett,* 50 Or. 329, 92 P. 820; *State v. Stevenson,* 98 Or. 285, 193 P. 1030. The record discloses no such error.

The next assignment of error is predicated upon an order of the circuit court which overruled defendant's motion for a new trial. This motion is based upon alleged misconduct of some of the jurors. Attached to the motion are the affidavits of three of the jurors. In each of the three affidavits it is stated that the affiant would have voted for manslaughter rather than for second degree murder if he had known that the law provided punishment for manslaughter. One affiant stated that he did not know that the jurors had a right to disagree. In defendant's brief, it is erroneously stated that it is disclosed in the affidavit of Eugene L. Murphy that one of the jurors had stated that she had read and was familiar with the Oregon law relating to manslaughter and was positive "that a verdict of manslaughter carried no punishment under the Oregon law." What was actually said in this affidavit in respect to that matter was as follows: "In open discussion with all present one of the jurors stated

that she was familiar with the Oregon law covering manslaughter and that she had recently read this law several times as her husband was a policeman and had a law book in her home which belonged to her husband and that she was positive of her statement.'' What her statement was, other than what appears in the excerpt just quoted, is not disclosed.

The court fully instructed the jury on the elements constituting the crimes of (1) murder in the first degree; (2) murder in the second degree, and (3) manslaughter. The court further told the jurors that when they retired for deliberation five forms of verdict would be submitted to them. The five forms, read to the jury, were: (1) First degree murder without recommendation; (2) first degree murder with recommendation; (3) second degree murder; (4) manslaughter; (5) not guilty.

██ It has been consistently held in this court that affidavits of jurors as to what occurred during their deliberations may not be received to impeach their verdict. *Cline v. Broy,* 1 Or. 89; *State v. Ausplund,* 86 Or. 121, 167 P. 1019; on rehearing, 87 Or. 649, 171 P. 395; *State v. McKiel,* 122 Or. 504, 259 P. 917; *Winters v. Bisaillon,* 152 Or. 578, 54 P. (2d) 1169, and authorities therein cited. No error was committed by the court in denying the motion for a new trial.

We have carefully read the entire record in the case and find that the defendant had a fair and impartial trial, and that no error was committed.

The judgment appealed from is affirmed.